UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

KYLE ENHOLM,

                Plaintiff,

  -against-

BALENCIAGA AMERICA, INC.
KERING AMERICAS, INC.,
VIRA CAPECI, individually, and
FABIO RIZZA, individually,

                Defendants.

------------------------------------------------------------------X

Civil Case No.: 1:25-cv-1828

**COMPLAINT**

Plaintiff Demands a
Trial by Jury

Plaintiff KYLE ENHOLM (hereinafter referred to as "Plaintiff") by and through her attorneys, DEREK SMITH LAW GROUP, PLLC, hereby complains of Defendants BALENCIAGA AMERICA, INC. ("BALENCIAGA"), KERING AMERICAS, INC. ("KERING"), VIRA CAPECI ("CAPECI"), individually, and FABIO RIZZA ("RIZZA"), individually, (hereinafter referred to collectively as "Defendants"), upon information and belief, as follows:

**NATURE OF CASE**

1. Plaintiff complains pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166) ("Title VII"), the Americans with Disabilities Act of 1990 ("ADA") as amended, the laws of the State of New York and the Administrative Code of the City of New York, based upon the supplemental jurisdiction of this Court pursuant to *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966) and 28 U.S.C. § 1367, seeking declaratory and injunctive relief and damages to redress the injuries Plaintiff has suffered as a result of, *inter alia*, sex/gender

discrimination, pregnancy discrimination, familial status discrimination, caregiver discrimination, disability discrimination, retaliation and unlawful termination by her employer.

## JURISDICTION AND VENUE

2. Jurisdiction of this action is conferred upon this Court as this case involves Federal Questions under Title VII, the FMLA and the ADA. The Court also has jurisdiction pursuant to 28 U.S.C. §1331, §1343 and pendent jurisdiction thereto.

3. Additionally, this Court has supplemental jurisdiction under the State law causes of action asserted in this action.

4. On or about October 23, 2023, Plaintiff filed a charge with the U.S. Equal Employment Opportunity Commission ("EEOC").

5. On or about December 3, 2024, Plaintiff received a Right to Sue Letter from the EEOC.

6. Plaintiff satisfied all administrative prerequisites and is filing this case within ninety (90) days of receiving the Right to Sue Letter.

7. Venue is proper in this District based upon the fact that the events or omissions that give rise to the claims asserted herein occurred within the Southern District of New York.

## PARTIES

8. At all times material, Plaintiff is an individual female who was a resident of the State of New York, County of Kings.

9. At all times material, Defendant BALENCIAGA AMERICA, INC. is a foreign business corporation duly existing by the virtues and laws of the State of Delaware that does business in the State of New York.

10. Defendant BALENCIAGA is a high-end international fashion brand based in France with North American offices located in New York City.

11. At all times material, Defendant KERING AMERICAS, INC. is a foreign business corporation duly existing by the virtues and laws of the State of Delaware that does business in the State of New York.

12. At all times material, Defendant KERING is a third-party consulting company retained by Defendant BALENCIAGA to administer BALENCIAGA's human resources services.

13. At all times material, Defendant BALENCIAGA and Defendant KERING jointly employed Plaintiff.

14. At all times material, Defendant BALENCIAGA employed Defendant VIRA CAPECI as the President/CEO of the Americas.

15. At all times material, Defendant CAPECI held supervisory authority over Plaintiff, controlling many tangible aspects of Plaintiff's job duties, including the power to hire and fire Plaintiff.

16. At all times material, Defendant BALENCIAGA employed Defendant FABIO RIZZA as Vice President of Human Resources for the Americas.

17. At all times material, Defendant RIZZA held supervisory authority over Plaintiff, controlling many tangible aspects of Plaintiff's job duties, including the power to hire and fire Plaintiff.

## STATEMENT OF FACTS

18. On or about June 12, 2018, Defendant BALENCIAGA hired Plaintiff as a Talent Acquisition Specialist based out of Defendant's New York City office.

19. At all times material, Plaintiff was an exceptional employee and always received stellar performance evaluations, promotions, top-tier bonuses, and merit-based salary increases.

20. At all times material, Plaintiff was diagnosed with anxiety disorder, a disability as defined by the ADA that causes mental impairment that can substantially limit major life activities.

21. Prior to COVID-19, Plaintiff was commuting to Defendants' NYC office five days per week. During this time Plaintiff's direct supervisor, Defendant BALENCIAGA's Human Resources Director, Tommie Mianecki, granted Plaintiff's request for a reasonable accommodation, and permitted Plaintiff to start her workday at 9:30 a.m. (instead of 9:00 a.m.) to avoid heavy rush-hour traffic and more anxiety-inducing travel times.

22. In or around April 2019, Defendant BALENCIAGA provided Plaintiff with a positive annual review, a full discretionary bonus, and a full annual merit increase to her salary.

23. In or around April 2020, Defendant BALENCIAGA again provided Plaintiff with a positive annual review and a discretionary bonus (Defendant did not award any annual merit increases during the COVID-19 pandemic).

24. During the onset of COVID-19, Defendant allowed all employees to work remotely.

25. In or around April 2021, Defendant BALENCIAGA again provided Plaintiff with a positive annual review, a full discretionary bonus, and a full annual merit increase to her salary.

26. Then, in or around July 2021, Defendant began requiring its employees to come into the office one day per week and announced that, by September 2021, all employees would be required to come into the office three days per week.

27. Shortly after this announcement, in or around July 2021, Plaintiff reminded Defendants that she had been provided workplace accommodations for her well-documented anxiety disorder. Plaintiff asked to continue to perform her work remotely, which was approved by Plaintiff's direct supervisor.

28. In or around July 2021, Plaintiff discussed her increasing anxiety with her supervisor, Mianecki, and relayed her psychiatrist's recommendation that Plaintiff limit her commute to the office to one day per week. Mianecki approved Plaintiff's accommodation request and

agreed that Plaintiff could come into the office on Tuesdays and work the remaining four workdays remotely.

29. Plaintiff filed the accommodation request with The Hartford, Defendants' third-party benefits provider.

30. In or around December 2021, based on Plaintiff's excellent performance, Defendant BALENCIAGA promoted Plaintiff to the title of Talent Acquisition Manager, which was accompanied by a $15,000.00 annual salary increase.

31. Around March 2022, Plaintiff engaged in a consensual romantic relationship with her coworker, Defendant BALENCIAGA's Southeast Visual Merchandising Manager, Matthew Sayers. At all times material, Sayers worked out of Defendant BALENCIAGA's Miami office and his role and job duties did not overlap with Plaintiff's in any capacity.

32. In consideration of their inter-office relationship, Plaintiff promptly consulted Defendants' Employee Handbook, which states in relevant part:

> In order to avoid the dangers resulting from such activity, and to help prevent even the appearance of improper conduct, **it is the Company's policy that both parties involved in such activity are required to report such activity/ relationship to a Human Resources representative.** The activities/ relationships subject to this required reporting policy include familial relationships, dating, romantic involvement, sexual relations and/ or the exchange of affections amongst the above stated individuals. The Company does not intend this policy to otherwise discourage friendship or social activities among company employees. **Nor does this policy prohibit such relationships** and activities but requires that romantic and familial relationships be reported as set forth herein to ensure that any actual or perceived conflict of interest is dealt with accordingly.

33. In accordance with Defendants' written policy, Plaintiff informed Defendant BALENCIAGA's Human Resources Business Partner, GABRIELLE DIPRETORO ("DIPRETORO"), along with the Regional Vice President of the Southeast, Kristina Segall, about her romantic relationship with Sayers.

34. In or around April 2022, Defendant BALENCIAGA again provided Plaintiff with a positive annual review, her full discretionary bonus, and an additional bonus for her exemplary work.

35. In or around April 2022, Plaintiff's supervisor, Mianecki, resigned from her employment with Defendants. Thereafter, Defendant BALENCIAGA appointed Carmela Greco as its interim Human Resources Director.

36. In or around June 2022, Plaintiff and Sayers decided to pursue a committed romantic relationship. Plaintiff and Sayers again promptly advised Defendants' Human Resources Department, in accordance with Defendant BALENCIAGA's Employee Handbook, of their relationship.

37. In or around June 2022, Defendant BALENCIAGA again provided Plaintiff with another $15,000.00 merit-based raise based on her exemplary performance.

38. Later in June 2022, Defendant BALENCIAGA announced that it was promoting Defendant RIZZA, Defendants' Human Resources Director, to the title of Vice President of Human Resources for the Americas, and that Defendant RIZZA would be transferred from Paris to BALENCIAGA's New York City office.

39. Defendant BALENCIAGA also advised Plaintiff that she would begin reporting directly to Defendant RIZZA, effective as of September 2022.

40. In or around July 2022, Plaintiff was introduced to her new supervisor, Defendant RIZZA, during a brief in-person meeting at BALENCIAGA's New York City office. Shortly after the meeting, Defendant RIZZA returned to Paris until he permanently relocated to the New York City office in September 2022.

41. In or around September 2022, Defendant RIZZA began working from BALENCIAGA's New York City office, where he worked directly alongside Plaintiff.

42. From the onset of Defendant RIZZA's new role, Defendant RIZZA began hosting one-on-one meetings with all of the members of Defendants' Human Resources ("HR") department. Plaintiff, who was a part of the HR Department, attempted to touch base with Defendant RIZZA on multiple occasions, and he repeatedly assured her they would sit down and meet in-person soon, but then never followed up with Plaintiff.

43. Plaintiff continuously reached out to Defendant RIZZA for job approvals to which RIZZA often responded, "ok for me," without offering any additional feedback or direction.

44. In or around September 2022, Plaintiff expressed to DIPRETORO that Defendant RIZZA seemed to be avoiding her and that she had been intending to inform RIZZA about her interoffice relationship with Sayers. DIPRETORO reassured Plaintiff that she had already followed protocol by advising Defendants' Human Resources about their relationship back in June 2022, and encouraged Plaintiff to remain patient and share this information with Defendant RIZZA in-person when they eventually had a one-on-one meeting.

45. In or around October 2022, Defendant RIZZA invited two of Plaintiff's less-tenured co-workers to accompany him to a conference in Paris but did not invite Plaintiff.

46. Later in October 2022, Defendant RIZZA finally requested a one-on-one meeting with Plaintiff for the following week, stating that they needed to "review corporate job vacancies."

47. As soon as Plaintiff arrived for their first scheduled meeting, Defendant RIZZA advised Plaintiff that they would not be discussing BALENCIAGA's corporate job vacancies nor Plaintiff's job duties. Rather, Defendant RIZZA informed Plaintiff that he requested the meeting to discuss Plaintiff's interoffice relationship with Sayers.

48. Defendant RIZZA shared that he had been informed about Plaintiff's relationship by Sayers' boss, Bennett Cousins ("COUSINS"), BALENCIAGA's Director of Visual Merchandising.

49. COUSINS was made aware of Plaintiff's relationship in June 2022, shortly after Plaintiff disclosed their relationship to Defendants' Human Resources.

50. To Plaintiff's surprise, Defendant RIZZA was irate and stated that Plaintiff had "embarrassed" him and questioned why he was not the first person made aware of Plaintiff's romantic relationship with Sayers. Taken aback, Plaintiff explained that the romantic relationship began prior to RIZZA starting his new supervisory role and being transferred to the New York City office.

51. Plaintiff further explained to Defendant RIZZA that she previously alerted Human Resources, in compliance with Defendants' Employee Handbook.

52. Notably, Defendant BALENCIAGA's company handbook states, in pertinent part:

> The Company acknowledges that romantic relationships in the workplace may occur and that romantic relationships develop in the workplace. **Dating is a personal choice and actions/ events that take place outside of the workplace are considered private and of no concern to Company.** The privacy of our employees is of utmost importance. The Company further acknowledges that, from time to time, members of the same family may join the Company team.

53. Notwithstanding Defendants' written policy, Defendant RIZZA instructed Plaintiff he was placing Plaintiff on a Performance Improvement Plan ("PIP") because of her alleged failure to alert Defendant RIZZA of her inter-office relationship. Defendant RIZZA informed Plaintiff that she would receive a written PIP in the coming weeks.

54. Significantly, Defendant RIZZA never disciplined Sayers in connection with his relationship with Plaintiff.

55. Defendant RIZZA discriminated against Plaintiff on the basis of her sex/gender.

56. Defendant RIZZA subjected Plaintiff to an adverse employment, by placing her on a PIP, for engaging in an interoffice relationship.

57. Plaintiff was extremely distressed after the meeting with Defendant RIZZA and complained to DIPRETORO about RIZZA's unlawful discrimination.

58. DIPRETORO was taken aback by Defendant RIZZA's unlawful response and apologized to Plaintiff for giving her the wrong advice.

59. Shortly thereafter, in late October 2022, Plaintiff learned that she was pregnant.

60. In early November 2022, Defendant RIZZA issued Plaintiff the PIP he threatened in their October meeting. However, the PIP did not mention anything about Plaintiff's romantic interoffice relationship. Instead, the PIP highlighted three alleged areas of improvement, which had never been discussed with Plaintiff during her initial one-on-one meeting with RIZZA, nor at any other time thereafter. Moreover, Plaintiff had been specifically praised for her work in the aforementioned areas during her annual review, which was only six (6) months prior.

61. Defendant RIZZA continued to discriminate against Plaintiff by issuing a PIP that was merely pretextual and inconsistent with their prior conversations.

62. Plaintiff immediately responded to Defendant RIZZA's e-mail, requesting to meet with him in-person to discuss the allegations listed in the PIP, as this information had never been discussed with or mentioned to Plaintiff during their previous meeting. RIZZA agreed to set up a time to meet with Plaintiff the following week to discuss the fabricated PIP.

63. Thereafter, Defendant RIZZA proceeded to cancel and reschedule every meeting he planned with Plaintiff from November 17, 2022, until January 10, 2023, nearly two (2) months later, in a clear attempt to evade Plaintiff's concerns and complaints.

64. Defendant RIZZA continued to discriminate against Plaintiff, subject Plaintiff to a hostile work environment, and retaliate against Plaintiff by refusing to meet with her and extending the PIP.

65. Despite this, Plaintiff followed the protocol contained in her pretextual PIP, which listed a specific timeline of informal and formal meetings as well as progress reports.

66. By mid-January 2023, Plaintiff had reached the second trimester of her pregnancy. Given Defendant RIZZA's reaction to her interoffice relationship, Plaintiff felt pressured to disclose her pregnancy to Defendant RIZZA before anyone else. However, Defendant RIZZA continued to delay Plaintiff's request for a meeting.

67. On or about January 9, 2023, Plaintiff met one-on-one with Defendant KERING's Vice President of Human Resources, VANNESSA BULLEN ("BULLEN"). Plaintiff complained to BULLEN that Defendant RIZZA continuously cancelled meetings with Plaintiff, and that she felt Defendant RIZZA was retaliating against her. Moreover, during this meeting, Plaintiff disclosed her pregnancy to BULLEN, who expressed her support for Plaintiff and Sayers.

68. On January 10, 2023, Defendant RIZZA finally scheduled a one-on-one meeting with Plaintiff.

69. During their meeting, Plaintiff disclosed her pregnancy to Defendant RIZZA and requested that he not share this information with any of Defendants' employees, unless it was vital that they were made aware as per Defendants' Employee Handbook.

70. Notably, pursuant to Defendant BALENCIAGA's Employee Handbook, "…The privacy of our employees is of utmost importance…"

71. Additionally, during their meeting on January 10, 2023, Plaintiff finally addressed her concerns regarding the ongoing PIP. Defendant RIZZA instructed Plaintiff that she would remain on the PIP until further notice.

72. Defendant RIZZA discriminated against Plaintiff, and subjected Plaintiff to a hostile work environment on the basis of her sex/gender and pregnancy.

73. Defendant RIZZA retaliated against Plaintiff for engaging in protected activity.

74. Later that month, Defendant RIZZA scheduled another meeting with Plaintiff to review the documents she completed in compliance with the PIP. Despite Plaintiff's continued compliance, Defendant RIZZA instructed Plaintiff that they needed another meeting for him to formally review her progress on or about February 1, 2023.

75. Thereafter, Defendant RIZZA advised BALENCIAGA's CEO/President, Defendant CAPECI, that Plaintiff was pregnant - despite Plaintiff's explicit request that he keep her pregnancy confidential.

76. On or about February 1, 2023, Defendant RIZZA met with Plaintiff to discuss her progress.

77. On or about February 7, 2023, Defendant RIZZA emailed Plaintiff a written progress report which confirmed that Plaintiff had been satisfactorily completing the tasks he listed in the PIP.

78. On or about February 13, 2023, Sayers was required to work from Defendant BALENCIAGA's New York City office. During his visit, Sayers worked from a separate floor than Plaintiff and they did not cross paths while in the office.

79. Nevertheless, on or about February 15, 2023, Defendant RIZZA requested a one-on-one meeting with Plaintiff to discuss an upcoming training that Plaintiff was scheduled to host. However, when Plaintiff entered Defendant RIZZA's office, Defendant RIZZA informed Plaintiff that he instead wanted to discuss her January expense report. Defendant RIZZA also requested that DIPRETORO sit in on their meeting.

80. During this meeting, Defendant RIZZA went through Plaintiff's expense report line by line and questioned the validity of all of Plaintiff's corporate charges.

81. Despite Plaintiff providing acceptable explanations for all of her corporate charges, Defendant RIZZA alleged that he "did not believe" her and intended to investigate the expenses further.

82. Notably, Plaintiff provided several examples of Defendants' male employees who expensed nearly identical work dinners at the same restaurants, yet were not questioned or reprimanded.

83. Defendant RIZZA continued to subject Plaintiff to a hostile work environment on the basis of her sex/gender and pregnancy, as well as retaliate against Plaintiff.

84. Additionally, during this same meeting, Defendant RIZZA questioned Plaintiff's disability accommodation for her anxiety disorder, which had been approved by Defendants since July 2021.

85. Defendant RIZZA stated that Plaintiff's accommodation was "ridiculous," and did not believe that Plaintiff's previous supervisor had ever actually approved it, despite written approval to the contrary.

86. Defendant RIZZA discriminated and retaliated against Plaintiff on the basis of her sex/gender, pregnancy, disability, and request for an accommodation.

87. On or about February 17, 2023, Plaintiff had a one-on-one meeting with DIPRETORO to discuss a collaborative project. DIPRETORO started the meeting by stating that she felt their previous meeting with Defendant RIZZA "sucked," and encouraged Plaintiff to file a complaint with Defendants' Ethics Committee.

88. Later that day, Plaintiff called Defendants' Ethics Hotline to initiate a formal complaint against Defendant RIZZA.

89. On or about February 20, 2023, as a result of the stress caused by Defendant RIZZA, Plaintiff scheduled an emergency doctor's appointment with her OB-GYN. Plaintiff was diagnosed with severe hypertension and preeclamptic symptoms. Plaintiff's doctors instructed Plaintiff to begin bedrest immediately due to the severe health risks to her pregnancy.

90. Immediately thereafter, Plaintiff advised Defendant KERING's Leave of Absence Manager, Sharon Griffin ("GRIFFIN"), that she needed to begin medical disability leave immediately.

91. On February 27, 2023, Plaintiff had her first meeting with Defendants' in-house attorney, Jacqueline Sacus ("SACUS"), to review the details of Plaintiff's discrimination complaint against Defendant RIZZA with the Ethics Committee. During this meeting with SACUS, Plaintiff discussed her claims and complaints about Defendant RIZZA in detail and provided SACUS with additional evidence and comparators.

92. In or around March 2023, Defendant RIZZA began copying Plaintiff on e-mail responses to SACUS, who was conducting the investigation into Plaintiff's ethics complaint. Defendant RIZZA made a point to show Plaintiff that he was aware she had lodged a discrimination complaint against him.

93. In or around late March 2023, Plaintiff met with SACUS to review the responses that Defendant RIZZA provided during SACUS' investigation. Namely, SACUS shared that, instead of addressing Plaintiff's discrimination complaints, Defendant RIZZA raised concerns regarding Plaintiff's expense reports. Moreover, SACUS stated that Defendant RIZZA raised concerns that Plaintiff's expenses were attributable to Sayers. Plaintiff quickly dispelled Defendant RIZZA's baseless claims by providing proof that the expenses were personal, legitimate, and permitted by Defendants' handbook.

94. Shockingly, during SACUS' unwarranted interrogation of Plaintiff, SACUS questioned the validity of Plaintiff's anxiety disorder. SACUS stated Defendant RIZZA alleged that Plaintiff was "faking it." Plaintiff painfully described her anxiety disability and accommodation at length, which Defendants had previously accommodated for the past two years without issue.

95. Defendants discriminated against Plaintiff on the basis of her disability.

96. Instead of performing an investigation into Plaintiff's discrimination and retaliation complaint against Defendant RIZZA, Defendants turned the investigation on Plaintiff, forcing her to defend herself against baseless and unwarranted accusations by Defendant RIZZA.

97. Plaintiff provided SACUS with numerous examples where her male colleagues expensed the same dinners, at the same restaurants, with the same co-workers, yet received no backlash whatsoever and were never questioned about their valid work expenses.

98. Defendants discriminated against Plaintiff on the basis of her sex/gender.

99. After their meeting, Plaintiff e-mailed SACUS with additional documentation to support her defenses. Moreover, Plaintiff noted that their conversation revolved entirely around Defendant RIZZA's unfounded claims and had nothing to do with Plaintiff's discrimination complaints.

100. SACUS failed to respond to Plaintiff's e-mail, and Plaintiff never heard back from SACUS regarding the discrimination and retaliation that Plaintiff was subjected to by RIZZA.

101. Quite tellingly, in or around April 2023, Defendants issued a new travel and entertainment policy that specifically addressed the concerns Defendant RIZZA had previously raised about Plaintiff's expenses during their February meeting.

102. In or around April 2023, Defendants' Ethics Committee notified Plaintiff via e-mail that her complaint of discrimination had been summarily closed, stating that there was no evidence of any wrongdoing on Defendant RIZZA's part, without offering any further explanation.

103. Notably, Defendants never provided Plaintiff with a single update or inquiry pertaining to her discrimination complaint. Defendants failed to provide Plaintiff any findings with respect to their purported investigation, or to the evidence that Plaintiff had provided.

104. On or about May 24, 2023, Plaintiff was induced at 37-weeks pregnant due to her high blood pressure.

105.    On or about May 26, 2023, Plaintiff gave birth to her child.

106.    Plaintiff's anticipated return to work date, pursuant to Defendants' leave policy, was scheduled for October 13, 2023.

107.    Notably, Defendants previously hosted and paid for its employees' baby showers, along with providing extravagant gifts to other employees who went out on maternity leave. Yet Defendants did no such thing for Plaintiff. In fact, Defendants did not even congratulate Plaintiff on the birth of her child.

108.    In or around July 2023, Plaintiff's leave transitioned from disability leave to maternity/child bonding leave. However, due to postpartum complications Plaintiff was unexpectantly required to undergo emergency surgery on July 16, 2023.

109.    Plaintiff informed Defendants of her surgery. In response, Defendants informed Plaintiff that when she was discharged from the hospital, she would be required to return to disability leave.

110.    Thereafter, Plaintiff remained on disability leave for an additional five weeks per Plaintiff's surgeon's instructions. Plaintiff was scheduled to return to work from maternity/child bonding leave on November 17, 2023.

111.    On or about September 1, 2023, while Plaintiff was still out on approved leave, DIPRETORO scheduled a meeting with Plaintiff for September 5, 2023.

112.    On or about September 5, 2023, Plaintiff joined the virtual meeting that had been scheduled by DIPRETORO.

113.    Unexpectedly, Defendant CAPECI joined the call and proceeded to terminate Plaintiff's employment without any warning or justification.

114.   Defendant CAPECI informed Plaintiff that Defendants had concerns about Plaintiff's "ability to be successful moving forward as the company had grown while [Plaintiff' was on leave and required more experience." Defendant CAPECI further alleged that Plaintiff's termination was also due to perceived "gaps in performance."

115.   When Plaintiff inquired about the alleged "gaps in performance," Defendant CAPECI responded that this was based on Defendant RIZZA's negative feedback.

116.   Defendants proffered reason was merely pretextual as Plaintiff was never disciplined and constantly had stellar performance reviews. The only issue with Plaintiff's performance was the discriminatory and retaliatory PIP issued by Defendant RIZZA.

117.   Plaintiff inquired further to her previous supervisor, Mianecki, who reiterated her positive experience working with Plaintiff, and pointed out all the raises, satisfactory bonuses, and the promotion, Plaintiff had received leading up to her pregnancy and medical leave.

118.   Defendants purported (and evolving) justifications for Plaintiff's discriminatory termination was clearly pretextual, as Plaintiff had only ever received positive feedback and annual reviews, including several annual raises and a promotion from her previous supervisors.

119.   At all times material, Defendant RIZZA never provided Plaintiff with any negative feedback during their required meetings (per the PIP he unjustifiably issued Plaintiff), aside from negative feedback about Plaintiff's relationship status and pregnancy.

120.   Additionally, RIZZA provided Plaintiff with a written progress report, which confirmed that Plaintiff had been completing her tasks as laid out by his unfounded PIP.

121.   Moreover, the only alleged "gaps in performance" that Defendant CAPECI noted were concerns relating to Plaintiff's expenses - which were only raised in response to Plaintiff's

discrimination complaint. Moreover, Plaintiff had previously explained and dispelled the unfounded complaint to SACUS.

122.    Notably, Defendants replaced Plaintiff with the temporary hire who was filling in for her while she was out on maternity/disability leave – a male employee named Ellington Berg, who was much less experienced than Plaintiff and completely new to the field of human resources.

123.    Defendants left Plaintiff unemployed with a newborn child to support, and eleven weeks of unused, paid leave remaining, pursuant to Defendants' leave policy.

124.    Based on the aforementioned facts, Defendants discriminated against Plaintiff because of her sex/gender, pregnancy, familial status, caregiver status, and disability, and terminated Plaintiff in retaliation for her accommodation requests and for engaging in protected activity

125.    At all times material, Defendants discriminated against, retaliated against, and terminated Plaintiff on the basis of her sex/gender, pregnancy, and disability, along with her familial and caregiver status.

126.    As a result of Defendants' actions, Plaintiff feels extremely humiliated, degraded, victimized, and embarrassed.

127.    As a result of Defendants' discriminatory and intolerable treatment, Plaintiff suffered and continues to suffer severe emotional distress.

128.    Plaintiff further claims aggravation, activation, and/or exacerbation of any preexisting condition.

129.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails. Plaintiff has also suffered future pecuniary

losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

130.    Plaintiff claims a continuous practice of discrimination and claims a continuing violation and makes all claims herein under the continuing violations doctrine.

131.    Plaintiff claims constructive and/or actual discharge and also seeks reinstatement.

132.    Plaintiff claims alternatively (in the event Defendants claim so or that the Court determines) that Plaintiff is an Independent Contractor, and Plaintiff makes all applicable claims for the above conduct and facts under the applicable laws pertaining to Independent Contractors.

133.    As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands Punitive Damages against all Defendants, jointly and severally.

134.    The above are just some examples of unlawful and discriminatory conduct to which Defendants subjected Plaintiff.


## AS A FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER TITLE VII
## (AGAINST DEFENDANTS BALENCIAGA & KERING)

135.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

136.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2(a) [Section 703] provides that it shall be an unlawful employment practice for an employer:

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . ."

137.    Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by subjecting Plaintiff to discrimination on the basis of her sex/gender, pregnancy, and disability, together with causing a hostile work environment based on the same.

138.    Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of Title VII.

139.    Defendants violated the above and Plaintiff suffered numerous damages as a result.


### AS A SECOND CAUSE OF ACTION
### FOR RETALIATION UNDER TITLE VII
### (AGAINST DEFENDANTS BALENCIAGA & KERING)

140.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

141.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a)

provides that it shall be unlawful employment practice for an employer:

"(1) to . . . discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

142.    Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e et seq., by retaliating against Plaintiff with respect to the terms, conditions or privileges of employment because of her opposition to the unlawful employment practices of Defendants.

143.    Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of Title VII.

144.    Defendants violated the above and Plaintiff suffered numerous damages as a result.

## AS A THIRD CAUSE OF ACTION
## FOR DISCRIMINATION UNDER
## THE AMERICANS WITH DISABILITIES ACT
## (AGAINST DEFENDANTS BALENCIAGA & KERING)

145.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

146.    Plaintiff claims Defendants BALENCIAGA and KERING violated Title I of the Americans with Disabilities Act of 1990 (Pub. L. 101-336) (ADA), as amended, as these titles appear in volume 42 of the United States Code, beginning at section 12101.

147.    SEC. 12112. [Section 102] specifically states "(a) General Rule. - No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

148.    Defendants violated the section cited herein by discharging, creating and maintaining discriminatory working conditions, and otherwise discriminating and retaliating against Plaintiff because of her disability.

149.    Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of the ADA.

150.    Defendants violated the above and Plaintiff suffered numerous damages as a result.

## AS A FOURTH CAUSE OF ACTION
## FOR RETALIATION UNDER
## THE AMERICANS WITH DISABILITIES ACT
## (AGAINST DEFENDANTS BALENCIAGA & KERING)

151.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above
paragraphs of this Complaint as if more fully set forth herein at length.

152.    SEC. 12203. [Section 503] states, "(a) Retaliation. - No person shall discriminate against
any individual because such individual has opposed any act or practice made unlawful by this
chapter or because such individual made a charge, testified, assisted, or participated in any
manner in an investigation, proceeding, or hearing under this chapter.

153.    Defendants engaged in unlawful employment practices prohibited by 42 U.S.C. §12203 *et
seq.*, by retaliating against Plaintiff with respect to the terms, conditions or privileges of
employment because of her opposition to the unlawful employment practices of Defendants.

154.    Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs
of the ADA.

155.    Defendants violated the above and Plaintiff suffered numerous damages as a result.

## AS A FIFTH CAUSE OF ACTION
## FOR VIOLATIONS OF THE
## FAMILY AND MEDICAL LEAVE ACT - 29 U.S.C. § 2601 ET SEQ.
## (AGAINST DEFENDANTS BALENCIAGA & KERING)

156.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above
paragraphs of this Complaint as if more fully set forth herein at length.

157.    §2612 of the Family Medical Leave Act states in pertinent part:

(a) In general

  (1) Entitlement to leave

Subject to section 2613 of this title, an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:

(A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.

(B) Because of the placement of a son or daughter with the employee for adoption or foster care.

(C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.

(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

(E) Because of any qualifying exigency (as the Secretary shall, by regulation, determine) arising out of the fact that the spouse, or a son, daughter, or parent of the employee is on covered active duty (or has been notified of an impending call or order to covered active duty) in the Armed Forces.

158.    Defendants violated Plaintiff's FMLA rights by failing to provide her with appropriate leave thereunder.


**AS A SIXTH CAUSE OF ACTION**
**FOR RETALIATION AND INTERFERENCE UNDER THE**
**FAMILY AND MEDICAL LEAVE ACT - 29 U.S.C. § 2601 ET SEQ.**
**(AGAINST DEFENDANTS BALENCIAGA & KERING)**

159.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

160.    § 2615 of the FMLA states as follows:

Prohibited acts

(a) Interference with rights

(1) Exercise of rights

It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

(2) Discrimination

It shall be unlawful for any employer to discharge or in any other manner    discriminate against any individual for opposing any practice made  unlawful by this subchapter.

161.    Defendants unlawfully interfered, restrained, and denied Plaintiff's right to exercise and attempt to exercise his rights under the above section and discriminated and retaliated against Plaintiff by terminating Plaintiff from her employment for opposing Defendants' unlawful employment practice and attempting to exercise her rights.


**AS A SEVENTH CAUSE OF ACTION
FOR DISCRIMINATION UNDER
NEW YORK STATE LAW
(AGAINST ALL DEFENDANTS)**

162.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

163.    New York State Executive Law § 296 provides that, "1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sex, or disability, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

164.    Defendants violated the section cited herein by discharging, creating and maintaining discriminatory working conditions, and otherwise discriminating against the Plaintiff because of her sex/gender, pregnancy, and disability.

165.    Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of New York State Executive Law Section 296.

166.    Defendants violated the above and Plaintiff suffered numerous damages as a result.

## AS AN EIGHTH CAUSE OF ACTION
## FOR RETALIATION UNDER
## NEW YORK STATE LAW
## (AGAINST ALL DEFENDANTS)

167.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above

paragraphs of this Complaint as if more fully set forth herein at length.

168.    New York State Executive Law § 296(7) provides that it shall be an unlawful

discriminatory practice: "For any person engaged in any activity to which this section applies

to retaliate or discriminate against any person because he has opposed any practices forbidden

under this article".

169.    Defendants engaged in an unlawful discriminatory practice by retaliating against Plaintiff

with respect to the terms, conditions or privileges of her employment because of her request

for a reasonable accommodation, as well as her opposition to the unlawful employment

practices of Defendants.

170.    Defendants violated the above and Plaintiff suffered numerous damages as a result.

## AS A NINTH CAUSE OF ACTION
## UNDER NEW YORK STATE LAW
## AIDING AND ABETTING
## (AGAINST ALL DEFENDANTS)

171.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above

paragraphs of this Complaint as if more fully set forth herein at length.

172.    New York State Executive Law §296(6) further provides that "It shall be an unlawful

discriminatory practice for any person to aid, abet, abet, incite, compel or coerce the doing of

any of the acts forbidden under this article, or to attempt to do so."

173.    Defendants engaged in an unlawful discriminatory practice by aiding, abetting, compelling and/or coercing the discriminatory behavior as stated herein.

174.    Defendants violated the above and Plaintiff suffered numerous damages as a result.

### AS A TENTH CAUSE OF ACTION
### FOR DISCRIMINATION UNDER
### THE NEW YORK CITY ADMINISTRATIVE CODE
### (AGAINST ALL DEFENDANTS)

175.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

176.    The Administrative Code of City of NY § 8-107 [1] provides that "It shall be an unlawful discriminatory practice: "(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienate or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

177.    Defendants engaged in unlawful discriminatory practices in violation of New York City Administrative Code Title 8, by creating and maintaining discriminatory working conditions and a hostile work environment, and otherwise discriminating against Plaintiff because of her sex/gender, pregnancy, and disability.

178.    Plaintiff hereby makes a claim against Defendants under all of the applicable paragraphs of New York City Administrative Code Title 8.

179.    Defendants violated the above and Plaintiff suffered numerous damages as a result.

**AS AN ELEVENTH CAUSE OF ACTION**
**FOR RETALIATION UNDER**
**THE NEW YORK CITY ADMINISTRATIVE CODE**
**(AGAINST ALL DEFENDANTS)**

180.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

181.    The New York City Administrative Code Tide 8, §8-107(1)(e) provides that it shall be unlawful discriminatory practice: "For an employer. . , to discharge . . . or otherwise discriminate against any person because such person has opposed any practices forbidden under this chapter. . . "

182.    Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Tide 8, §8-107(1) (e) by discriminating against the Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Plaintiff's employer.

183.    Defendants violated the above and Plaintiff suffered numerous damages as a result.


**AS A TWELFTH CAUSE OF ACTION**
**FOR AIDING AND ABETTING UNDER**
**THE NEW YORK CITY ADMINISTRATIVE CODE**
**(AGAINST ALL DEFENDANTS)**

184.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

185.    The New York City Administrative Code Title 8, §8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

186.    Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct.

187.    Defendants violated the above and Plaintiff suffered numerous damages as a result.


**AS A THIRTEENTH CAUSE OF ACTION**
**FOR DISCRIMINATION UNDER**
**THE NEW YORK CITY ADMINISTRATIVE CODE**
**(AGAINST ALL DEFENDANTS)**

188.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above

paragraphs of this Complaint as if more fully set forth herein at length.

189.    Section 8-107(19), entitled Interference with protected rights provides that "It shall be an

unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with,

or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or

enjoyment of, or on account of his or her having aided or encouraged any other person in the

exercise or enjoyment of, any right granted or protected pursuant to this section."

190.    Defendants violated the above section as set forth herein.


**AS A FOURTEENTH CAUSE OF ACTION**
**FOR EMPLOYER LIABILITY UNDER**
**THE NEW YORK CITY ADMINISTRATIVE CODE**
**(AGAINST ALL DEFENDANTS)**

191.    Plaintiff repeats, reiterates and realleges each and every allegation made in the above

paragraphs of this Complaint as if more fully set forth herein at length.

192.    Section 8-107(13) entitled Employer liability for discriminatory conduct by employee,

agent or independent contractor provides "An employer shall be liable for an unlawful

discriminatory practice based upon the conduct of an employee or agent which is in violation

of any provision of this section other than subdivisions one and two of this section." b. An

employer shall be liable for an unlawful discriminatory practice based upon the conduct of an

employee or agent which is in violation of subdivision one or two of this section only where: (1) the employee or agent exercised managerial or supervisory responsibility; or (2) the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or (3) the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

193.    Defendants violated the above section as set forth herein.

## **JURY DEMAND**

Plaintiff requests a jury trial on all issues to be tried.

**WHEREFORE,** Plaintiff demands judgment against Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, punitive damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Dated:  March 3, 2025
New York, New York

**DEREK SMITH LAW GROUP, PLLC**
*Attorneys for Plaintiff*

_____
Zachary Holzberg, Esq.
One Penn Plaza, Suite 4905
New York, New York 10119
(212) 587-0760